IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:26-mj-28 |
| | ) | |
| OSCAR RAQUEL CUELLAR MACUA, | ) | |
| | ) | |
| EVELYN ESMERALDA VILLATORO, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OSCAR VLADIMIR PADILLA PORTILLO | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT IN SUPPORT OF A
## CRIMINAL COMPLAINTS AND ARREST
## WARRANTS

I, Ian Meyers, Special Agent of the Federal Bureau of Investigation ("FBI"), being

first duly sworn, depose and state as follows:

### INTRODUCTION

1.     I submit this Affidavit in support of a criminal complaint charging OSCAR

RAQUEL CUELLAR MACUA (hereafter "CUELLAR"), EVELYN ESMERALDA

VILLATORO (hereafter "VILLATORO"), and OSCAR VLADIMIR PADILLA PORTILLO

(hereafter "PORTILLO"), from in and around December 2024 to at least in and around January

2026, in the Eastern District of Virginia and elsewhere, with unlawfully, knowingly, and

intentionally combining, conspiring, confederating, and agreeing with each other and others,

known and unknown, to unlawfully, knowingly, and intentionally possess with intent to distribute

more than five kilograms of a mixture and substance containing a detectable amount of cocaine,

a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846 (conspiracy) and Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute a controlled substance).

2.     I am a Special Agent with the Federal Bureau of Investigation, and have been since January 2006. I am currently assigned to a squad that investigates criminal enterprises and violent gangs for the Washington Field Office's Northern Virginia Resident Agency. I have training and experience in the areas of gang-related criminal activity, narcotics trafficking, interview and interrogation techniques, evidence recovery, source recruitment, arrest procedures, search and seizure, cellular phone analysis and various other crimes. In my capacity as a Special Agent, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants. I have 12 years of previous investigative experience in national security matters and have focused on investigating drug and violent criminal activities for the past eight years.

3.     While with the FBI, I have participated in the investigation of gang members as well as narcotics traffickers and possessors. I know through training and experience that individuals involved in firearms and narcotics trafficking frequently use cellular telephones to further their illegal activities (a) as the phones allow them to stay in contact with one another without restricting them to a fixed location where they might be the subject of physical surveillance by law enforcement authorities; and (b) because they erroneously believe that the interception of cellular communications is impossible or at least more difficult than interception

2

of landline telephones. Further, firearms and drug traffickers rarely expressly refer to firearms and controlled substances by name while communicating over telecommunications devices (to conceal the true nature of their illegal activities and to avoid detection by law enforcement, they refer to the firearms and drugs and drug quantities using seemingly innocent terms).

4.    The facts in this Affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and law enforcement personnel. This Affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.    Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846 (conspiracy) and 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance) have been committed by CUELLAR, VILLATORO, and PORTILLO.

## PROBABLE CAUSE

6.    The offenses under investigation arose from a series of controlled purchases of weapons and narcotics utilizing a confidential source (hereafter the "CS," and referred to in the masculine regardless of gender) within the Eastern District of Virginia. The CS has been paid three times for rental-related assistance and has no criminal history besides illegally crossing the United States border.[1] All of the controlled purchases have been recorded, and the recordings are consistent with the exchanges as relayed by the CS to law enforcement after the controlled purchases. In addition, the CS and their vehicle were searched by law enforcement personnel before and after each controlled purchase. The CS was also followed to and from each controlled

---

[1] The confidential source has been granted a temporary deferred action by the U.S. government and law enforcement is pursuing a visa.

purchase by law enforcement personnel with little to no gap in coverage. Much of the information provided by the CS has also been independently corroborated by law enforcement both in this investigation as well as in previous investigations. In addition, during previous investigations, the CS was neither paid, nor did they have deferred action status as they were seeking asylum and did not have a prospect of a visa at the time. For these reasons, I consider the CS reliable.

7.    In and around the summer of 2024, Individual-1 told the CS that he had a friend who could get the CS weapons without serial numbers on them. Thereafter, Individual-1 introduced the CS to was JORGE STEVE ZEPEDA IRIAS (hereinafter "ZEPEDA"). (I learned that ZEPEDA uses the nicknames "Tiburcio," which is the name Individual-1 knew him by, and "Tiburón," which is what ZEPEDA later told the CS was his nickname. Tiburón is the name for "shark" in Spanish. However, for the sake of clarity, I will refer to ZEPEDA by the name ZEPEDA going forward in this Affidavit). Individual-1 said that ZEPEDA's phone number was 703-XXX-8781.

8.    Further investigation revealed that Tiburcio's true name was JORGE STEVE ZEPEDA IRIAS and that the Prince William County Police Department ("PWCPD") had a cooperating witness (hereafter the "CW") who witnessed ZEPEDA with a "van full of weapons." The CW believed ZEPEDA to be associated with Mexican cartels and had heard that ZEPEDA had tried to sell grenade launchers in the past. The CW also noted that ZEPEDA can sell ammunition and cocaine, as well as weapons. FBI internal database checks revealed ZEPEDA's phone number to be associated with four additional investigations, with three of them in other FBI field offices.

9.    Additionally, a U.S. Immigration and Customs Enforcement ("ICE")

4

Enforcement and Removal Operations ("ERO") task force officer conducted records checks through Department of Homeland Security ("DHS") databases that contain known and previously deported aliens, and U.S. Citizenship and Immigration Services ("USCIS") databases that contain petitions and applications pending with USCIS filed by U.S citizens, persons with legal status, and aliens. ZEPEDA was arrested by ICE on July 15, 2013 and placed into removal proceedings. ZEPEDA's immigration case is currently ongoing; he has a removal order, which he has been appealing, and he has additionally filed for permanent resident status.

10.    Further, ZEPEDA has a criminal history. He was charged in Prince William General District Court with brandishing a firearm in September 2023. This charge was reduced to misdemeanor disorderly conduct in February 2024, to which ZEPEDA pled guilty. ZEPEDA was also charged in Loudoun County General District Court with felony larceny in July 2013 and failure to appear in March 2014. The government has not been able to ascertain how both charges were resolved, however, it appears that the charges are no longer pending.

11.    Between on or about July 26, 2024 and on or about January 21, 2026, ZEPEDA sold numerous firearms (pistols, rifles, and a shotgun) as well as cocaine and fentanyl, in controlled sales to the CS, all of which were recorded and took place in the Eastern District of Virginia and Washington, D.C. The CS communicated with ZEPEDA to set up each purchase, and law enforcement searched the CS and provided pre-recorded buy funds prior to each buy. Law enforcement also monitored and conducted surveillance for each buy and retrieved the weapons and substance(s) purchased, searched the CS, and debriefed the CS after each buy.

12.    On or about September 22, 2025, the CS drove to ZEPEDA and ROMERO's residence to conduct a controlled purchase of multiple firearms and a half kilogram of cocaine. After arriving at the residence, ZEPEDA sold the CS a Glock, Model 43X, bearing serial number

5

BNPE575, with a 9mm round in the chamber as well as a magazine with six rounds of 9mm ammunition in it. The CS paid ZEPEDA $1,500 for this firearm. ZEPEDA was running late and, instead of giving the Glock 43X to the CS, ZEPEDA retained possession of the Glock 43X and placed it in his bag and then placed his bag and the Glock 43X in his new gray Dodge Ram truck, bearing Virginia license plate TCS 2627.

13.    ZEPEDA then drove the CS and his wife JENIFER ICELA ROMERO FABIAN (hereinafter "JENIFER ROMERO") to the Cerritos Ranch in Haymarket, Virginia. At the Cerritos Ranch, ZEPEDA called Armand LNU, whom ZEPEDA referred to as the "Italian guy." The CS saw that Armand had a 1911 pistol on his person while at the Cerritos Ranch. Armand had a white Ford F150 pickup truck with an open bed and was selling green beans at the Cerritos Ranch. Armand took a rifle out of the backseat of the truck. ZEPEDA asked the CS for $2,500, which the CS provided to ZEPEDA. ZEPEDA gave the $2,500 to Armand in exchange for the rifle, a Ruger AR15, bearing serial number 1852-23073.

14.    While at the Cerritos Ranch, ZEPEDA met with JUAN FRANCISCO ENRIQUEZ CERRITOS (hereinafter "CERRITOS"). The CS saw CERRITOS with two people whom he suspected were gang members because of the way they walked and one appeared to be wearing Nike Air Force One shoes and an El Salvador hat. The CS gave ZEPEDA the buy money for another firearm, another $2,500. ZEPEDA told the CS to stay in the car, so the CS stayed in the car with JENIFER ROMERO. The CS saw CERRITOS go inside his house, which is located on the property of the Cerritos Ranch. Then CERRITOS came out of his house with a rifle. The CS saw ZEPEDA give CERRITOS $2,500 and CERRITOS give ZEPEDA the rifle, a Remington 770, 30-06 caliber rifle, bearing serial number 71418219. NCIC was run on each of these firearms and there was no record of them being stolen. ATF E-Traces were also conducted with one name

6

noted as being the name of a person from whom ZEPEDA is believed to be purchasing firearms based on pictures sent to the CS from ZEPEDA with this subject's name on the purchase tag.

15.    Notably, while ZEPEDA was openly conducting these firearms deals with Armand and CERRITOS outside at the Cerritos Ranch, the CS saw at least 20 people at the Cerritos Ranch.

16.    After purchasing these firearms, ZEPEDA, JENIFER ROMERO, and the CS departed the Cerritos Ranch and went to a gas station in the Eastern District of Virginia before driving again.  During the drive, JENIFER ROMERO told the CS that MS-13 members are not wearing tattoos lately.  ZEPEDA said that he used to sell five guns a week to MS-13.  They made social conversation and ZEPEDA said that he used to transport drugs.

17.    ZEPEDA called an unknown individual on a What's App video call.  They next went to Arlington, Virginia, in the Eastern District of Virginia, and met with **CUELLAR**, who would facilitate the half kilogram cocaine deal in Washington, DC.

18.    Specifically, in Arlington, Virginia, they met up with a silver Toyota Tacoma, bearing Maryland tag 7GT7430.  The Toyota Tacoma was driven by **VILLATORO** and **CUELLAR** was sitting in the front passenger seat.  **CUELLAR** told them to follow him.

19.    During the trip, JENIFER ROMERO coached the CS on how to handle themselves with the cocaine seller if they met him.  ROMERO said words to the effect that this individual was a big player.  They continued to follow the Tacoma driven by **VILLATORO** to the Georgetown neighborhood of Washington, D.C., where they pulled into the old gas station lot located at 3601 M Street NW, Washington, DC, that is also a famous tourist attraction known as "The Exorcist Steps," because the concrete stairs were featured in the 1973 film *The Exorcist*.[2]

---

[2] *See Exorcist* steps, *available at*: https://www.trolleytours.com/washington-dc/exorcist-steps.

20.    When they arrived at the parking lot, the CS noticed a black male with corn rows sitting in a silver Dodge Durango. The black male gave a "thumbs up" gesture, then departed the area. Approximately two minutes later, a white Mercedes arrived.

21.    ZEPEDA and **CUELLAR** exited their respective vehicles, ZEPEDA gave $11,500 from the CS to **CUELLAR** and got into the cocaine seller's vehicle, the white Mercedes. The CS later stated that they believed the white Mercedes to be a late model Mercedes that resembled a GL300 model with dark window tint. The CS and law enforcement were not able to see the cocaine seller because of the dark window tint. While the license plate of the white Mercedes was not identified during the operation, the CS's description of the white Mercedes is consistent with a white Mercedes later identified by law enforcement, as described below. ZEPEDA left the CS in ZEPEDA's Dodge Ram with JENIFER ROMERO. ZEPEDA, with **CUELLAR**, then purchased a half kilogram of cocaine with $11,500 of the CS's buy money from the cocaine seller in the white Mercedes. After the cocaine purchase, ZEPEDA returned to his vehicle, handed the cocaine to the CS, and they drove away shortly thereafter. **CUELLAR** and **VILLATORO** also drove away.

22.    After the purchase of the cocaine, ZEPEDA drove JENIFER ROMERO and the CS back to ZEPEDA and ROMERO's residence in the Eastern District of Virginia. The half kilogram field tested positive for cocaine and the FBI sent it to the DEA's laboratory for further testing. Subsequently, the DEA chemical analysis report for the approximate half kilogram of cocaine listed the substance as cocaine hydrochloride.

23.    On or about October 21, 2025, the CS drove to ZEPEDA and ROMERO's residence, in the Eastern District of Virginia, to conduct a controlled purchase of one kilogram of cocaine and two firearms. Upon arriving at ZEPEDA and ROMERO's residence, ZEPEDA

8

went inside the residence and came out with an AR-15 and put it in a red truck. ZEPEDA then asked to count the money before he would take the CS "up there." After counting the money, ZEPEDA made several calls to ensure the deal was ready. Before leaving the house, the CS paid ZEPEDA a $500 commission for the deal and another $500 for **CUELLAR** to facilitate the deal. The CS then paid ZEPEDA another $600 in commission that ZEPEDA had requested multiple times leading up to this meeting for facilitating the half kilogram of cocaine deal on September 22, 2025. ZEPEDA then asked for another $200 for gas for driving the CS to the deal in his vehicle.

24.    At this point, ZEPEDA, JENIFER ROMERO, and the CS departed the ZEPEDA and ROMERO residence with ZEPEDA driving his grey Dodge Ram truck with Virginia license plate TCS 2627. They drove to Arlington, Virginia to meet with **CUELLAR,** the same individual whom they followed to Washington, DC in the silver Toyota Tacoma on September 22, 2025. This time, **CUELLAR** did not have a ride with **VILLATORO** so they picked him up and drove him to the "Exorcist Steps" in Washington, DC to conduct the purchase of the one kilogram of cocaine.

25.    When they arrived at the deal location, the CS gave ZEPEDA $23,000 to purchase the cocaine. ZEPEDA wrapped the money in a black sweater and both he and **CUELLAR** entered a red Volkswagen Tiguan SE, bearing Washington, DC license plate JF1452 where ZEPEDA purchased the cocaine with $23,000 of the CS's buy money from an individual later identified by law enforcement as JORGE MANUEL ROMERO.

26.    The registered owner in Washington, DC of the red Volkswagen Tiguan SE, bearing Washington, DC license plate JF1452 is JORGE MANUEL ROMERO. Law enforcement surveillance captured a photograph of JORGE ROMERO—whom the CS later

confirmed was the driver of the red Volkswagen Tiguan. The surveillance photo also matches JORGE ROMERO's DC DMV photo. Of note, JORGE ROMERO has a 2025 Mercedes GLE Coupe AMG, VIN 4JGFD6BB7SB371000, registered to him in Washington, DC with DC license plate JR9121. An open source search of publicly available data on this VIN yielded a result of the same make and model vehicle that is black in color. However, license plate reader images have repeatedly shown a white Mercedes with DC license plate JR9121 that is white in color and law enforcement has photographed a white in color Mercedes with DC license plate JR9121 in the parking garage of the Washington, DC apartment building where JORGE ROMERO resides. I reference the September 22, 2025 cocaine deal where the unidentified cocaine seller arrived in a white Mercedes—the description of which matches the images of a white Mercedes GLE bearing DC license plate JR9121 captured by license plate readers and photographed at JORGE ROMERO's apartment building's garage. There is no known association or family relationship between JORGE ROMERO and JENIFER ROMERO. JORGE ROMERO's criminal history includes a conviction for attempted distribution of a controlled substance in 2011 and a misdemeanor conviction for possession of a controlled dangerous substance-not marijuana in 2019.

27.      Upon exiting the Tiguan, ZEPEDA and **CUELLAR** returned to ZEPEDA's Dodge Ram—which was still occupied by the CS and JENIFER ROMERO. ZEPEDA brought back a kilogram of cocaine which ZEPEDA gave to the CS and a small amount of crack cocaine which he handed to JENIFER ROMERO. The CS requested and obtained half of this crack cocaine from ZEPEDA. The kilogram and the crack field tested positive for cocaine and the FBI sent both to the DEA's laboratory for testing. Subsequently, the DEA chemical analysis report

10

for the approximate kilogram of cocaine listed the substance as cocaine hydrochloride and listed the other substance as cocaine base in rock-like form.

28.    Based on my training and experience, there is probable cause to believe that JORGE MANUEL ROMERO sold the cocaine to ZEPEDA, **CUELLAR,** and the CS in both instances for the following reasons: the September and October cocaine buys were the only cocaine deals the CS made with ZEPEDA that took place in Washington, DC; both of these cocaine deals involved significantly more cocaine than any of ZEPEDA's previous sales to the CS; both cocaine deals involved the same facilitator—**CUELLAR**; both cocaine deals took place in the same location in Washington, DC; the two deals took place only a month apart; and JORGE ROMERO has both a Mercedes and a Volkswagen registered in his name in Washington, DC.

29.    ZEPEDA, JENIFER ROMERO, **CUELLAR,** and the CS then departed the parking lot and drove to Arlington, Virginia, in the Eastern District of Virginia, and dropped off **CUELLAR.**

30.    After dropping off **CUELLAR,** ZEPEDA, JENIFER ROMERO, and the CS went back to ZEPEDA and ROMERO's residence. Once back at the residence, ZEPEDA removed the AR-15 from his red truck and handed it to the CS. The CS purchased this Stag Arms model Stag-13 AR15, bearing serial number 41444, and two empty metal magazines from ZEPEDA for $2,600. The CS had planned to purchase two pistols from ZEPEDA, but ZEPEDA said this is what he was selling to the CS. An NCIC query of this firearm shows no record of being stolen and an ATF E-Trace that does not indicate anything significant.

31.    On or about December 11, 2025, the CS conducted a controlled purchase of six firearms and various ammunition at the Cerritos Ranch. Upon arriving at the Cerritos Ranch, the CS saw CERRITOS, JENIFER ROMERO, and ZEPEDA. ZEPEDA told the CS that the firearms

11

were in ZEPEDA's red truck. The CS got into ZEPEDA's red truck and paid $15,000 for only six firearms when he was supposed to get eight firearms from ZEPEDA. When the CS pushed back on this, ZEPEDA told the CS that the Uzi was special and that the firearms are very expensive.

32.    After the CS paid ZEPEDA, ZEPEDA tried to call a contact who could register a firearm in the CS's name. ZEPEDA did not tell the CS the contact's name, but the contact told ZEPEDA that the contact had an AR for sale for $1,800. The CS also asked if they could purchase narcotics while they were still at the Cerritos Ranch, but ZEPEDA said that he did not have any narcotics at the Cerritos Ranch at that time, but if the CS had told him earlier, he could have set up a deal. ZEPEDA also told the CS that he has an M60 at the ZEPEDA and ROMERO residence. From my training and experience, I know that an M60 is a type of machinegun. ZEPEDA also told the CS that the CS needs to buy more than two kilograms of cocaine the next time the CS buys cocaine from ZEPEDA.

33.    The various evidentiary items that ZEPEDA sold the CS during this controlled purchase were: a Double Star Corp, Star 15, Multi Caliber, black rifle, bearing serial number D0025056 (with one magazine); a Sarsilmaz, Sar 9 Mete, 9mm caliber, tan pistol, bearing serial number T1102-22CD63068 (with two magazines); a Beretta USA Corp, APX A1, 9mm caliber, black pistol, bearing serial number AXC178064 (with one magazine); a Glock, Model 17, 9mm caliber, black pistol, bearing serial number AGV040 (with attached light and one extended magazine); a Masterpiece Arms, Model M10 (45 ACP), .45 caliber, black pistol, bearing serial number A4655 (with two magazines and a cosmetic "suppressor"); a Ruger, Model GP100, .357 caliber, black revolver, bearing serial number 170-22747; 16 rounds of .45 caliber ammunition in a plastic bag; and 48 rounds of various assorted calibers of ammunition.

34.     JORGE MANUEL ROMERO was arrested early in the morning of January 21, 2026, as he was attempting to depart the United States for El Salvador.

35.     A controlled purchase of controlled substances, which obtained approximately four kilograms of cocaine, confirmed by field testing, took place on the afternoon of January 21, 2026 in Washington. D.C. This transaction was organized by ZEPEDA and **CUELLAR**, and facilitated by **VILLATORO** and JENIFER ROMERO.

36.     The CS was driven to Arlington, Virginia, by ZEPEDA in a Dodge Ram with Virginia license plate TCS 2627, with JENIFER ROMERO also in the vehicle. In Arlington they were joined by the Tacoma driven by **VILLATORO**, with **CUELLAR** in the passenger seat. ZEPEDA then followed **VILLATORO** to a parking lot in the vicinity of 1850 U St. in Washington, D.C., where the deal took place.

37.     At the parking lot ZEPEDA and **CUELLAR** got into the back seat of a different Dodge Ram, driven by **PORTILLO**, with the $88,000 for the controlled buy, and then came out with cocaine and returned to ZEPEDA's truck and began to leave.

38.     At this point law enforcement moved in on the scene. ZEPEDA, JENIFER ROMERO, **CUELLAR**, and **VILLATORO** were taken into custody.

39.     The driver of the second Dodge Ram, who was subsequently identified as **PORTILLO**, was blocked in by an FBI vehicle, and **PORTILLO** then rammed the FBI vehicle and sped away at a high rate of speed. However, this Dodge Ram ended up being caught in traffic, and **PORTILLO** was arrested. It is believed that a second individual escaped **PORTILLO's** vehicle with the buy money prior to **PORTILLO's** arrest.

40.     Law enforcement found in **PORTILLO's** Dodge Ram empty marked money bands from the controlled buy and a money counter. The money bands were on the driver's seat where

**PORTILLO** had been sitting. A Maryland temporary vehicle registration for **PORTILLO** was also found in the vehicle, which had Maryland tags.

41.     ZEPEDA and JENIFER ROMERO were arrested and law enforcement recovered from their vehicle approximately four kilograms of a substance that field tested positive for cocaine.

## CONCLUSION

42.     Based on the foregoing, I respectfully submit that there is probable cause to believe from in and around July 2024 to at least in and around January 2026, in the Eastern District of Virginia and elsewhere, **CUELLAR**, **VILLATORO**, and **PROTILLO** unlawfully, knowingly, and intentionally combined, conspired, confederated, and agreed with each other and others, known and unknown, to unlawfully, knowingly, and intentionally possess with intent to distribute more than five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846 (conspiracy) and Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute a controlled substance).

Respectfully submitted,

Ian Meyers
Special Agent
Federal Bureau of Investigation (FBI)

Subscribed and sworn to in accordance with
Fed. R. Crim. P. 4.1 by telephone on
January 22, 2026.

The Honorable Lindsey R. Vaala
United States Magistrate Judge

14